LOREN H. NAUSS, administrator, *vs.* BOSTON AND MAINE RAILROAD.

Essex.  November 8, 1906. — May 15, 1907.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, & RUGG, JJ.

*Negligence.  Railroad.*

In an action under R. L. c. 111, § 267, by the administrator of one whose life was alleged to have been lost by reason of the gross negligence of the defendant's agents or servants, there was evidence from which a jury might have found that the plaintiff's intestate, with a fellow member of a veteran fireman's association and members of the defendant's train crew, had been loading a hand fire engine upon a flat car of the defendant for transportation from Waltham to Lawrence, that then the employees of the defendant had departed, and the car, bearing the hand fire engine and the plaintiff's intestate and his companion, who were to accompany the fire engine upon its journey, had been switched to a siding to be coupled later to a train which then was switching in the yard, that while on the siding the plaintiff's intestate and his companion were engaged on the car in covering and further securing the fire engine for its journey, that, while they were on the car and "picking up" after their work, the defendant's

employees without warning to the plaintiff's intestate caused an engine and fourteen cars to be backed against the car upon which the plaintiff's intestate was, thus causing a jar neither excessive nor unusual nor greater than is reasonably necessary in the coupling of freight cars, and he was thrown from the car, run over and killed. *Held*, while there was evidence upon which a jury might find that the defendant's agents or servants were negligent, there was none upon which they could find them grossly negligent.

TORT by the administrator of John A. Nauss. Writ in the Superior Court for. the county of Essex dated February 4, 1904.

The declaration contained three counts, but the case was submitted to the jury by the presiding judge on the second count only, which was for recovery under R. L. c. 111, § 267, for loss of the life of the plaintiff's intestate, not a passenger of the defendant, by reason of the unfitness and gross negligence of the defendant's agents and servants ; and the presiding judge further ruled that there was no evidence to warrant a finding that the intestate lost his life by reason of the unfitness of the defendant's agents and servants.

There was a trial before *Fox*, J. It appeared in evidence that the plaintiff's intestate - was one of two members of the Veteran Fireman's Association of Waltham who had charge of loading that association's hand fire engine upon a flat car of the defendant for transportation to Lawrence for a fireman's muster there, and who were to accompany the car on its journey. The plaintiff's intestate fell from the flat car because it was jarred in coupling to other cars and was run over and killed under the circumstances described in the opinion. The presiding judge ruled that upon all the evidence the jury would° not be warranted in finding that the jar to the car upon which the intestate was standing at the time of the accident was excessive or unusual, or greater than is reasonably necessary to the coupling of freight cars.

Beside the facts which appear in the opinion, a superintendent of a division of the defendant's railroad, called by the plaintiff, testified that so far as he knew the only rule of the defendant in force at the time of the accident for shifting cars was as follows : "In switching at stations and in yards where it is necessary to disturb cars that are being loaded or unloaded great care must be taken to warn all persons in the vicinity of the same and opportunity given them to get away from the cars and out of dan-

ger before the cars are moved.    Where cars are so moved they must be returned to the same position and placed in an equally convenient place for loading and unloading."

The presiding judge ruled that the above rule did not apply to the shifting of the flat car upon which the plaintiff was after it had left the place where it was loaded.    The evidence bearing on the question whether the flat car from which the plaintiff's intestate fell had left the place where it was loaded, as well as other material facts, are stated in the opinion.

There were other exceptions by the defendant, but, in view of the decision, the only ones which are material are to the refusals of the presiding judge to make the following rulings:

" 2.    Upon all the evidence the plaintiff is not entitled to recover under the second count of his declaration."

" 5.    Upon all the evidence the jury would not be warranted in finding that the plaintiff's intestate lost his life by reason of the gross negligence of the defendant's agents and servants.

" 6.    There is no evidence to warrant the jury in finding that the accident was due to or caused by the gross negligence of the defendant's agents and servants."

" 8.    There is no evidence to warrant the jury in finding that at the time of the accident the plaintiff's intestate was in the exercise of due care."

There was a verdict for the plaintiff.

The case was argued at the bar in November, 1906, before *Knowlton*, C. J., *Hammond*, *Braley*, *Sheldon*, & *Rugg*, JJ., and afterwards was submitted on briefs to all the justices.

*D. E. Hall*, (*H. F. Hurlburt* with him,) for the defendant.

*W. A. Pew, Jr.*, for the plaintiff.

HAMMOND, J.    As finally submitted to the jury this was an action of tort brought under R. L. c. 111, § 267, by the administrator of the estate of John A. Nauss, to recover for the death of the intestate who was not a passenger.    The accident happened about half past nine o'clock in the morning of June 2, 1903.    One of the questions is whether the evidence warranted a finding of gross negligence on the part of the defendant's servants and agents.

It appeared that the defendant had contracted to carry that day a fire engine from Waltham to Lawrence; that after the

engine had been placed upon a flat car belonging to the defend-
ant and standing upon a "siding" north of the main track, near
the station at Waltham, the train hands who had been engaged
in the loading left the car; that then the deceased and one
McCleaves, both of whom were members of the fire company and
had assisted in the loading, by the permission of the defendant,
went upon the car for the purpose of "shoeing" the engine, cov-
ering it with cloth and taking other precautions to protect it from
injury while on its journey.   The evidence tended to show that
while they were thus engaged the freight train came along, —
the train upon which the "tub was to go," and they both knew
it.   McCleaves, called by the plaintiff, testified that shortly
after the arrival of this train, "some of the men . . . came over
and asked us if we were ready and I said 'John, . . . [meaning
Nauss] . . . we are not ready to haul out yet.'   Then the ques-
tion was asked if she was ready so she could be shifted.   I said,
'Certainly she can be shifted.' . . . They gave us fair warning
then to look out because they were going to shift us over. . . .
After the engine backed up they started us out down over
Lyman Street and threw us out on the other siding, that is, the
one on the right hand or south side of the main track.   I should
judge they threw us over 100 or 150 feet from Lyman Street.   I
don't know now the distance; I have forgotten.   I wouldn't
swear now how many cars they threw with us.   All I can testify
to is that there were other cars with ours.   They threw off two
cars anyway and perhaps more. . . . The car which was thrown
off with us was a large box car.   It was on the Boston side of
our car and hitched to our flat car.   After we were thrown off
there I don't know what became of the engine. . . . I should say
there were 15 cars more or less.   Our flat car was the rear car
and the engine was at the other end of the train towards Boston.
. . . After we had been backed down on the other siding in the
way I have described we kept on working."

As to the manner of the accident McCleaves testified that he
had finished and was pulling off his overalls; and that while he
was doing this "the first . . . [he] . . . knew there was a heavy
jar" which "slewed" him.   "I grabbed on the spear handle and
when I turned there was no other man there, so I jumped to see
what the trouble was. . . . I had no warning that there was to

be any jar. . . . The last I saw of Nauss he was standing on the right hand side within a foot or eighteen inches of the end of the car, . . . on the right hand side of the car. The last time I saw him doing anything on the car he was picking up tools which belonged in the chest. After we received this jar the car moved. I jumped right off as soon as I could. . . . I jumped off on the right hand side and saw him [Nauss] under the car. . . . The train kept moving back and it seemed to roll him right over and over. . . . His whole body was between the rails. . . . The car in front of us went over him and part of another car. . . . When I got to Nauss he was dead." He further testified that he had no information from anybody that the train was backing down and did not pay any attention to the train; that Nauss and he were the only persons on the car. Upon cross-examination he testified that at the time of the jar the fire engine was all right so far as he was concerned. " Everything had been done that there was to do except looking after the other small stuff that was around there. The small stuff had been picked up so far as I know. . . . I had no further duty to perform so far as the engine or anything upon the car was concerned. . . . I had seen Nauss on the opposite side of the spear, up towards the chest. . . . I didn't see him after I came around down from where I was. Just before I walked up I took my position on the left hand side of the spear, I was standing right up near him, right at the edge of the chest on the right hand side of the spear. We had been there for quite a while, five or ten minutes perhaps. We were right at the end of the chest . . . only simply talking. . . . Then I started and went around the chest . . . I left Nauss about where we had been talking at the right hand corner of the chest . . . within eighteen inches of the sleeper perhaps." This sleeper was upon the car. He further testified that he heard no warning of the approach of the car, although he testified that he was not paying any attention for a warning. There was evidence that after the accident a padlock was found lying near the body and that the chest was unlocked. The conductor of the freight train testified that he gave notice of the backing down of the train.

The deceased and McCleaves knew that the flat car was to form a part of the train which was being made up, and that the

car would soon be attached to it. Their position was one in which they were bound to take these facts into consideration. The case is different from that in which the party has a right to think that he can work in safety without paying any heed to his position. The conductor of the train had the right to expect that the men on the car, fully aware of the general purpose of the movements of the train engine and of the connection of the flat car with these movements, would under the circumstances expect some disturbance and would not place themselves where a jar likely to arise from the coupling of the car would throw them under the wheels. Assuming therefore that, as a precaution to insure their safety in case of their failure to protect themselves, due care called for some warning of the coupling of the cars, we think, in view of the circumstances, that the failure to give such a warning, while it may be evidence of negligence, falls far short of showing gross negligence. In other words, to the conductor there did not appear to be any such probability that these men would be so regardless of their own safety as to place themselves where they would be in danger of falling under the wheels or being otherwise seriously injured if there was a coupling without warning, as to make a failure to give warning gross negligence as distinguished from ordinary negligence. The case differs from cases like *Hartford* v. *New York, New Haven, & Hartford Railroad*, 184 Mass. 365, where the conductor fails to give a warning when men are supposed to be working under the cars or elsewhere, in such relation to the car as to lead to reasonable apprehension that an unexpected or premature starting of the car would lead to death or serious injury. See *Moran* v. *Milford & Uxbridge Street Railway*, 193 Mass. 52; *Dolphin* v. *Worcester Consolidated Street Railway*, 189 Mass. 270.

*Exceptions sustained.*